IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BREAHYA OVERTON,** *Plaintiff* | : : : | **CIVIL ACTION** |
| v. | : : | |
| **SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY,** *Defendant* | : : : : | **No. 20-6027** |

## MEMORANDUM

PRATTER, J.                                                                                         APRIL 8, 2022

Breahya Overton lost her job after a dispute with a passenger on a rush hour SEPTA train. The passenger was white; Ms. Overton is black. Months after her firing, Ms. Overton filed a complaint with the EEOC, asserting for the first time that the passenger had discriminated against her based on her race. She then filed this employment-discrimination suit against SEPTA. But she has not shown that SEPTA discriminated against her based on her race. The Court thus grants summary judgment to SEPTA.

### BACKGROUND

#### I.   The Job

Breahya Overton was hired as an assistant conductor in May 2019. She had classroom training for the first six weeks, followed by two weeks of on-the-job training. She then started working on a regional rail route, which ran from downtown Philadelphia to the suburbs.

During her employment, Ms. Overton had a few disciplinary issues. Once, she was spotted eating on the train platform. Under SEPTA's rules, employees are not supposed to eat in front of passengers. After spotting her eating, Sean Gardner, the transportation manager, asked her to finish her food in the vestibule area for employees. According to Donte Julia, the director of night

1

operations who witnessed the interaction, Ms. Overton "rolled her eyes and walked away." Doc. No. 20, at ¶ 32. Ms. Overton explains that she did not realize that Mr. Gardner was a manager.

Approximately one month later, Ms. Overton was spotted wearing the wrong shoes, which was a safety violation; a supervisor told her that she needed to follow the dress code. Two weeks later, she was told she had on the wrong uniform pants. Later, she was once again told by a manager that she had on the wrong work boots. Despite this, Ms. Overton continued to wear the boots because another, more senior manager had complimented them.

## II. The Incident

In early September, Ms. Overton had an altercation with a passenger on a rush hour train. Coming into 30th Street Station, Ms. Overton left her bag on the seat of the train and got off the train. When she returned, her bag had been moved, and a passenger was sitting in the seat. The passenger, a white woman, asked Ms. Overton if she wanted her bag, but Ms. Overton said nothing. The passenger asked again, and Ms. Overton responded, "Normally when you see someone's belongings on the seat, that means that the seat is occupied." Doc. No. 20, at ¶ 62. Under SEPTA's rules, employees are not supposed to put their personal belongings on passenger seats, and Ms. Overton knew that her bag should not have been there.

Upset, the passenger asked Ms. Overton, "Aren't you at work?" *Id.* at ¶ 63. Viewing this as "taunting," Ms. Overton went to talk to another assistant conductor. *Id.* at ¶ 64. At Suburban Station, Ms. Overton got off the train, found Luther Chiles, the station manager, and requested that he remove the passenger from the train. Mr. Chiles told her that he could not remove the passenger, but that he would go on the train to "diffuse the situation." *Id.* at ¶ 69. On the train, Ms. Overton pointed a finger at the passenger, which, Mr. Chiles said, agitated the passenger and two others. Mr. Chiles told Ms. Overton to grab her bag. As she did, the passenger said, "I think that's the best

2

thing to do." *Id.* at ¶ 73. The passenger then asked for Ms. Overton's name, which Ms. Overton refused to provide. Another passenger chimed in and said, "No one touched your belongings." *Id.* Ms. Overton responded, "I wasn't talking to you." *Id.* Once off the train, Mr. Chiles told her that she should have moved her bag and cautioned her that her "attitude" could cost her the job. *Id.* at ¶ 78.

### III. The Investigation

Three passengers filed complaints, calling Ms. Overton "rude," "argumentative," and "unprofessional." Doc. No. 20, at ¶¶ 85–87. SEPTA immediately opened an investigation into the incident. When interviewed, Ms. Overton said that she "would not call it an argument, [the] passenger addressed [her] and [she] addressed back." Doc. No. 17-3, at 2. Besides, she asserted, the passenger was the one to blame, for the passenger had "antagonized" and "threatened" her. *Id.* at 5.

Based on the investigation, Mr. Julia, the director of operations, decided to fire Ms. Overton. She had been previously been counseled for not following the dress code and for eating on the train platform. Plus, the incident on the train was considered serious. SEPTA's rules require employees to "treat customers in a polite, respectful, professional manner at all times" and "exercise patience and self-control when interacting with passengers;" "[e]mployees must not at any time be discourteous or disrespectful" or "contribute to a dispute or altercation with a passenger." Doc. No. 20-2, at 38, 41. As Mr. Julia saw it, Ms. Overton did not meet that standard.

The Union stepped in and asked SEPTA to reconsider its decision, suggesting that perhaps SEPTA could suspend her instead. Mr. Julia reached out to Mr. Chiles, the station manager who had observed the incident; Mr. Chiles confirmed that Ms. Overton had been "loud and arguing with customers." Doc. No. 20, at ¶ 119. Based on that, SEPTA stuck with its decision.

Ms. Overton then emailed Jack Lauser, the senior director of railroad operations, to ask him to reconsider. He informed her that the decision was final.

Ms. Overton filed an internal complaint with SEPTA's Equal Employment Opportunity Department, claiming that her supervisors had harassed her when they repeatedly told her that she was violating SEPTA rules. She did not allege that her termination had been based on her race, nor suggest that the altercation with the passenger involved any racially charged remarks. After an investigation, the Department concluded that the various managers had followed protocol in counseling her for the rule violations.

### IV. This Suit

Four months later, Ms. Overton filed a complaint with the EEOC, claiming—for the first time—that she had been fired based on her race. Specifically, she claimed that, during the incident on the train, the white passenger had threatened her "with racially charged remarks" by calling her a "girl." Doc. No. 20, at ¶¶ 141–43.

The EEOC issued a right-to-sue letter, and Ms. Overton filed this suit *pro se*, claiming that SEPTA discriminated against her based on her race.[1] She moved for appointment of counsel, and the Court put the case on the employment panel, where Ms. Overton's counsel took on the case.[2]

SEPTA has now moved for summary judgment on all claims.

### LEGAL STANDARDS

For a court to grant summary judgment, the movant must prove "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To be "material," the fact must have the potential to "affect the outcome of the suit."

---

[1] Ms. Overton also brought claims for retaliation and a hostile work environment. As she represented at oral argument, she has since dropped those claims.

[2] The Court thanks counsel for doing so. Members of the Bar provide immeasurable services to litigants and the Court in this regard.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute about that fact to be "genuine," there must be enough evidence such that a reasonable jury could find for the non-movant on that fact. *Id.* The court does not "[it]self ... weigh the evidence and determine the truth of the matter." *Id.* at 249. Instead, the court looks for "sufficient evidence" on which a reasonable jury could decide for the non-movant. *Id.* If the court finds none, the case should not proceed to trial.

Courts grant summary judgment "sparingly" in employment-discrimination cases, where issues of credibility and intent often abound. *Doe v. CARS Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008); *Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 509–10 (3d Cir. 1996). But this caution does not relieve employees of their burden to point to "probative" evidence of discrimination that is more than "merely colorable;" "mere allegations" of discrimination "are insufficient." *Anderson*, 477 U.S. at 249; *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021).

## DISCUSSION

Title VII forbids an employer from discriminating against an employee on the basis of her race. 42 U.S.C. § 2000e-2(a). To prove discrimination, an employee can provide direct evidence of discrimination. Absent direct evidence, employees may rest on indirect evidence of discrimination under one of two frameworks: *McDonnell Douglas*'s burden-shifting framework and *Price Waterhouse*'s mixed-motive framework. Under the *McDonnell Douglas* framework, the employee must show but-for causation—that is, that the employer would not have fired her but for her race. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *Price Waterhouse* framework, the employee may show just that her race was a motivating factor in the termination, even if not a determinative one. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Though the *Price Waterhouse* framework demands a lighter burden of the employee, it also provides less

lucrative remedies: just declaratory and injunctive relief, no damages. *See Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348–49 (2013).

Ms. Overton has no direct evidence that SEPTA fired her based on her race. Instead, pointing to the circumstances of her termination, she rests on both *McDonnell Douglas*'s burden-shifting framework and *Price Waterhouse's* mixed-motive framework. Under either framework, however, her claim fails because no reasonable juror could find in this record any evidence that SEPTA discriminated against Ms. Overton based on her race.

### I. Ms. Overton cannot show that she would not have been fired but for her race

Under the *McDonnell Douglas* framework, Ms. Overton must first make out a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If she does, SEPTA needs to articulate some legitimate, nondiscriminatory reason" for the termination. *Id.* The burden then shifts back to Ms. Overton, who must prove that SEPTA's offered reason is actually just "a pretext for discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Even construing all facts in her favor, *Doe*, 527 F.3d at 362, Ms. Overton cannot carry her burden. She has not made out a prima facie case that SEPTA discriminated against her. Nor has she shown that SEPTA's stated reason for firing her—that she had issues with both supervisors and customers—was just a pretext for discrimination.

### A. Ms. Overton has not made out a prima facie case of discrimination

For her prima facie case, Ms. Overton must show that (1) she belongs to a protected class, (2) she was qualified for the position, (3) she experienced an adverse employment action, and (4) she did so under circumstances suggesting that the decision was based on her race. *McDonnell*

6

*Douglas*, 411 U.S. at 802. She easily satisfies the first three prongs.[3] But she falls far short on the fourth.

To Ms. Overton, SEPTA discriminated against her based on her race when, instead of siding with Ms. Overton over the passenger, SEPTA fired her for getting into a dispute with a passenger. This, Ms. Overton asserts, is enough to show that, but for her race, SEPTA would not have fired her. This argument, however, demands too many logical leaps.

Start with the passenger, who Ms. Overton says discriminated against her based on her race. As her sole proof, Ms. Overton asserts that the passenger called her a "'girl' in a derogatory way" during their exchange on the train. Doc. No. 25, at 7. To be sure, calling a black woman a "girl" can have racial undertones. But the circumstances are key. Depending on the "context, inflection, tone of voice, local custom, and historical usage," the term "girl" might be "evidence of racial animus," or it might be "benign." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

Based on the evidence in the record, no reasonable jury could find the use of "girl" here to be indicative of racial animus. The passengers involved never mentioned race during the interaction or in the complaints filed afterwards (besides identifying Ms. Overton in the "Employee Description" field as a young black woman in between 5' and 5'6"). Doc. No. 20-2, at 47–49. And at age 26, Ms. Overton *was* relatively young at the time of the incident. Indeed, in their complaints, the passengers identified Ms. Overton as being "[y]oung," in her "early 20s." *Id.* One passenger even complained about her relative youth and suggested that SEPTA's "young" employees "need[ed] a heavy dose of customer service training." *Id.* at 49. Plus, Ms. Overton did not even claim that she viewed this particular use of the term "girl" as racially discriminatory until months

---

[3] Though conceding that Ms. Overton was *objectively* qualified for the job, SEPTA suggests that she was not *subjectively* qualified because she did not meet SEPTA's customer service standards. But just because she did not live up to these standards does not mean that she was not capable of doing so. *See Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 462–63 (E.D. Pa. 2013).

7

later, when she filed her complaint with the EEOC as a precursor to this suit. *Cf. West v. City of Bethlehem*, No. 11-cv-1194, 2011 WL 5105381, at *1–2, *5 (E.D. Pa. Oct. 26, 2011) (supervisor repeatedly calling black employee a "boy" might be "indicative of discrimination" where his supervisor openly treated him worse than his white coworkers and his coworkers often made racist comments and tried to get him into trouble).

Even if the passenger's exchange with Ms. Overton was racially motivated, however, that *still* does not mean that *SEPTA* discriminated against Mr. Overton based on her race. Title VII forbids employers, not customers, from discriminating against employees. 42 U.S.C. § 2000e-2(a). No matter how racist the customer, the employee must still tie her firing to the *employer's* discrimination. That is, the employee must show that the customer's discrimination "*motivate[d]* [the] adverse employment action." *Tamosaitis v. URS Inc.*, 781 F.3d 468, 483 (9th Cir. 2015) (emphasis added). For example, a business does not automatically discriminate by letting customers with racial animus shop there. But it does discriminate if it "refuse[s] on racial grounds to hire someone because [its] customers or clientele do not like his race." *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1181 (7th Cir. 1982).[4]

Here, Ms. Overton falls far short of tying the passenger's conduct to SEPTA's own alleged racial discrimination. To start, Ms. Overton never told SEPTA that she considered the passenger's

---

[4] That does not mean that employers can permit customers to openly discriminate against employees, for employers can create hostile work environments by not handling discriminatory customers. *Weston v. Pennsylvania*, 251 F.3d 420, 427–28 (3d Cir. 2001), *overruled on other grounds by Burlington Northern & Santa Fe. R&R Co. v. White*, 548 U.S. 53, 67–68 (2006); *accord Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005) ("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it," even absent "pro[of] that discriminatory animus motivated the [employer's] failure to act."). For the employer's silence to become actionable, the customer discrimination must "permeat[e]" the workplace "with discriminatory intimidation, ridicule, and insult" so as "to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted); *cf. Billman v. Easton Area Sch. Dist.*, No. 20-cv-2730, 2021 WL 5448963, at *6 (E.D. Pa. Nov. 22, 2021) (reasonable jury could find that school created hostile work environment by failing to discipline parents that used racial slurs and threatened and assaulted coach). As Ms. Overton admitted at oral argument, the incident with the passengers here did not amount to a hostile work environment.

N/A

conduct discriminatory until well after she was fired. In her interview immediately after the incident, Ms. Overton did not assert that the term "girl" was offensive nor claim that the dispute had been racially motivated. Nor did she say so in her appeal letter to the senior director of railroad operations. For SEPTA to have discriminated by failing to address racial discrimination from a customer, it would first have to *know* that that the customer discriminated. *Cf. Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104–05 (3d Cir. 2009).

To get around this, Ms. Overton suggests that SEPTA did not provide her a chance to explain herself. The record indicates otherwise. During the investigation, Ms. Overton submitted a full page detailing her version of the incident yet said nothing about race. Doc. No. 17-3, at 5. Likewise, her Union representative, speaking on her behalf, said nothing about race. Nor did her email to senior director of railroad operations Jack Lauser suggest that the incident was racially motivated. At oral argument, Ms. Overton explained that she did not mention race earlier because she wanted to be cooperative so she could keep her job. Yet Ms. Overton still did not raise the issue in her complaint with SEPTA's Equal Employment Opportunity Department, which she submitted *after she had been fired* and had already been refused her job back. Either way, her belated explanation does not change the fact that SEPTA was not on notice, at the time of the firing, that Ms. Overton considered the incident to be racially motivated.

Otherwise, Ms. Overton has produced no evidence that SEPTA acted with discriminatory intent. Her supervisors made no offensive comments, nor even hinted at race during the incident, the investigation, or the termination. *See Blackwell-Murray*, 963 F. Supp. 2d at 465. Plus, Ms. Overton has not identified a single comparator—that is, any other conductors who got into a dispute with customers but were not fired. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). This lack of comparators indicates that SEPTA is treating "similarly

9

situated employees ... equally," no matter their race. *Tx. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981).

For these reasons, Ms. Overton has not made out a prima facie showing that SEPTA discriminated against her based on her race.

### B. Ms. Overton has not shown that SEPTA's reason for firing her is pretext

Even if Ms. Overton had made out a prima facie case of racial discrimination, she has not shown that SEPTA's stated reason for firing her was pretext.

From the start, SEPTA has said that Ms. Overton was fired because she got into a serious dispute with a passenger on a crowded train at rush hour that prompted three customer complaints and a warning from the station manager. That, given her other admittedly small disciplinary issues, led SEPTA to believe that Ms. Overton was not a good fit for the job. This is a legitimate, nondiscriminatory reason for termination. *See Smith v. City of Allentown*, 589 F.3d 684, 691–92 (3d Cir. 2009); *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995). To proceed to trial, Ms. Overton must discredit this proffered reason and show instead that SEPTA "discriminated against [her] and was merely trying to conceal its" racial animus by claiming that it was concerned about customer service. *Brewer*, 72 F.3d at 331. She has not done so.

SEPTA's rules dictate that employees are to "treat customers in a polite, respectful, professional manner at all times" and "exercise patience and self-control when interacting with passengers"—even difficult ones. Doc. No. 20-2, at 38. Ms. Overton does not contest that such customer-skills were essential to her role. As an assistant conductor, Ms. Overton constantly interacted with passengers as she collected tickets and monitored the train cars. During the rush-hour incident, her performance fell short of SEPTA's standards: as she admits, she was short with a passenger who moved her bag on a busy train, and then tried to have the passenger removed from

the train before telling another passenger who tried to intervene, "I wasn't talking to you." Plus, Ms. Overton had had prior disciplinary issues, including not wearing the proper uniform, eating where she was not supposed to, and rolling her eyes at a supervisor. Given all this, no reasonable jury could "disbelieve" that poor job performance was SEPTA's true reason for firing her. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *cf. Brewer*, 72 F.3d at 331–32 (employer's explanation that salesperson was fired because he was unorganized might have been pretext where salesperson had strong sales record, which the company admittedly considered the most important part of the job).

Ms. Overton insists that the incident with the passenger was not her fault, and so she should not be blamed for her curt response to the passenger. But employers need not make "wise, shrewd, prudent, ... competent" or even fair decisions, just non-discriminatory ones. *Fuentes*, 32 F.3d at 765; *Logue v. Int'l Rehab. Assocs., Inc.*, 837 F.2d 150, 155 n.5 (3d Cir. 1988). Even if SEPTA did hold Ms. Overton to too high a customer-service standard in the face of supposedly rude passengers, no reasonable jury could find that SEPTA's focus on customer service is "so plainly wrong" as to be a front for discrimination. *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

In sum, Ms. Overton has not met her burden under the *McDonnell Douglas* framework, for she has not pointed to sufficient evidence in the record to show that SEPTA would not have fired her but for her race.

II.  **Ms. Overton has not shown that her race was a motivating factor in her firing**

Nor could reasonable jurors find that Ms. Overton's race even motivated her firing. If an employee cannot prove but-for causation, she may attempt to prove simply that race was a "motivating factor" in her firing. 42 U.S.C. § 2000e-2(m). If she rests on this lesser burden, and

the employer shows that it would have fired her regardless of her race, then the employee gets no damages, just injunctive relief, such as reinstatement. *Nassar*, 570 U.S. at 348–49.

Ms. Overton suggests that SEPTA decided to fire her at least in part because of her race. But, as explained above, she has provided zero evidence that SEPTA even *considered* her race in its decision. "Merely reciting that [race] was the reason for [an employer's] decision does not make it so." *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). Thus, Ms. Overton has not met her burden under the *Price Waterhouse* framework either.

## CONCLUSION

Ms. Overton has not provided sufficient evidence from which a reasonable juror could conclude that SEPTA fired her based on her race. The Court thus grants summary judgment to SEPTA. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE